## JAMES B. CLOW & SONS v. AUTOMATIC GAS–STEAM RADIATOR CO.

District Court, W. D. Pennsylvania.

No. 2210.

Brown & Critchlow, of Pittsburgh, Pa., and Wilkinson, Huxley, Byron & Knight, of Chicago, Ill., for plaintiff.

Byrnes, Stebbins & Parmelee, of Pittsburgh, Pa., for defendant.

THOMSON, District Judge. ▮ Plaintiff, who is the owner of the Eugene V. Daily patent, No. 1,580,651, for a gas-fired radiator, sues for infringement of claims 1, 2, and 3. The ownership of the patent and the manufacture and sale of defendant's alleged infringing device, after the issuance

of the patent, April 13, 1926, and before the bringing of suit, are admitted.

Defendant's radiators were of two forms. When the suit was brought, the plaintiff knew of defendant's manufacture of radiators of the specific construction represented by plaintiff's Exhibit C, and learned only just before the trial of defendant's discontinuance of that particular form of radiator, and the adoption of the particular construction disclosed by Defendant's Exhibit 4. Both forms of radiator were manufactured by defendant after the issuance of the patent and before the bringing of suit, and plaintiff claims that both devices infringe.

In the trade, there are two general forms of gas-fired appliances for heating buildings. In one, the heat is generated at one point, as a steam-heating plant in the basement, and is conducted through pipes and liberated through radiators, in the various rooms. In the other, the self-contained heaters, the gas is burned and the heat liberated within the same appliance. This latter class is again divisible into two forms: One, as in the ordinary gas stove, in which the heat of the gas flame is transferred directly to the atmosphere surrounding the appliance. In the other, the heat from the gas flame enters into an intermediate vehicle, which transmits the heat to radiating surfaces. Thus, in gas-fired steam radiators, the heat generated by the gas flame is imparted to water, which is turned into steam, and the steam condensing in the radiator, gives up heat to radiating surfaces.

The design, which is involved here, is a gas-fired heater in which water is the agent for transmitting the heat to the rooms. The appliance shows that this method provides a more uniform temperature throughout the room than those in which the heat is transmitted directly from the flame, which causes a concentration of heat in the vicinity of the device itself. Not only is the manner of heat different, but the problems presented in design and construction are also different.

Radiators burning gas were found to be desirable from the standpoint of utility, convenience, economy, and cleanliness. The early gas-fired radiators were known as vented, or those connected with a flue, and unvented, those having no such connection; in the latter, the products of combustion were discharged directly into the room. This latter method had many disadvantages. In natural gas territories when the sulphur in the gas was burned, it had a smarting effect on the organs of respiration. In northern climates, where the percentage of moisture was high, the addition of moisture from the burning gas caused condensation or precipitation on the windows and walls of the room, which was very objectionable. These, and other resulting conditions, made the vented radiator much superior to the unvented. But in the vented type a serious problem was presented in venting. In the early type of vented radiators, it was found that, with an ordinary normal draft up the chimney, the operation of the burner was usually satisfactory. But in practical operation the draft in an ordinary chimney varies from a strong outgoing draft up the chimney to a strong incoming draft passing back down the chimney. When a strong out draft was suddenly created, the tendency was to pull or lift the flame off the burner, causing the gas to be only partially burned, or the flame to be extinguished. Dangerous results also followed, where a back draft suddenly rushed down the chimney, and the rising products of combustion were forced back onto the gas flame, causing a partial smothering of the flame, resulting in an incomplete combustion and the formation of poisonous carbon monoxide gas, or the flame would be extinguished entirely, allowing the unignited gas to escape into the room.

To meet these varying conditions, there was a definite demand for a satisfactory vented radiator; but no satisfactory type appeared prior to the Daily type of radiator, covered by the patent in suit, application for which was filed in August, 1922, and the patent issued in April, 1926. This radiator appears to be the first to provide a practical vented gas-fired steam radiator, equipped in such a manner as to perform properly under varying conditions of installation and use, and under varying conditions of draft. This radiator appears to have been alone in the field from 1922 until 1928, when defendant's radiator, which is claimed to infringe, appeared.

Both the plaintiff's and defendant's radiator comprise a plurality of sections, the central one of which forms a vent section for the entire radiator. This section, marked 2, in Figure 1 of the plaintiff's patent, is connected with a flue, and the products of combustion from the entire radiator pass outwardly through the flue, which is connected with this section. Thus both are vented radiators, both are vented through the flue connection, which leads from section 2, and this section, though specially constructed in defendant's radiator, must be regarded as a "vent section."

The lower portions of the radiator sections, as shown in Figure 1, have laterally projecting ribs, which, together with the end walls, form a closed chamber, divided into an upper and lower portion by means of the horizontally extending boiler or water chamber 8. Beneath the water chamber, in the lower portion of the closed chamber, a burner is located for heating the water, and this portion is termed "the combustion chamber." Between the adjacent sections, the products of combustion pass upwardly and enter the upper portion of the closed chamber above the water chamber. They then flow lengthwise into the central vent section and are vented through the connection 21, which connects directly with the flue. A baffle 23 directs the rising products of combustion away from the atmospheric openings 22 rearwardly toward the flue opening 21.

In the normal operation of both the plaintiff's and defendant's radiators, heat from the burner is imparted to the water chamber, causing steam, which rises in the radiator and fills its upper portion. The products of combustion rise from the combustion chamber, and all flow into the vent section. The rising products of combustion move toward the flue opening in the rear of the vent section, and that portion of the products of combustion which rises farthest from the flue opening is deflected by means of a baffle, backwardly in the direction of the flue opening.

Two very serious problems in the use of the vented radiator were met and overcome by Daily in his construction: First, taking care of the back draft of wind down the chimney, without interfering with the proper burning of the gas; and, second, providing against an excessive out draft upwardly through the chimney, tending to lift the flame and causing incomplete combustion or extinguishment of the flame.

As to the first: In the Daily radiator, the back draft enters through the flue connection A, flows across the upper portion of the vent section, and is then discharged through the openings B in front of the baffle. In this operation, as the down-rushing draft passes through the vent section, it flows transversely to the normal course of the products of combustion, causing the latter to be deflected in their travel. From this description it will be seen that a back draft flowing through the radiator will syphon out the products of combustion, meanwhile allowing them to flow upwardly in the radiator and perform their heating function, without interfering with the normal operation of the burner.

As to the second problem: A strong up draft causes an increased supply of air to be drawn through the openings in front of and above the baffle, and thus the up draft, instead of exerting a lifting power on the products of combustion, its strength is dissipated by drawing additional air from the atmospheric openings without interfering with the normal operation of the burner or the travel of the products of combustion. The description of these two very important operations of the Daily patent is also applicable to the construction of the defendant's radiator.

Defendant challenges the validity of the patent in suit, and also denies infringement. The patents mainly relied upon by the defendant are Frampton, Hartfield, and Cinq-Mars, No. 1,392,479. Of these, the defendant's expert, Mr. Sessions, in his testimony, concluded that the Hartfield patent was the closest. This patent was considered by the Patent Office at the time the Daily application was pending, and was cited against it. In this situation, the grant of the patent over a reference, the courts have held that the regular presumption of validity accompanying a patent gains added weight.

The Hartfield patent discloses a construction entirely different from plaintiff's, does not anticipate the subject-matter of the claims, and there is specific evidence to the effect that the patent discloses a device that is inoperative. The device is not a gas steam radiator, as there is no provision for an intermediate heating medium, but is really a gas-fired radiator of the gas stove type. It appears to meet none of the objects and features of the Daily radiator, and fails to anticipate the subject-matter of the Daily claims.

Without unduly extending this opinion, I could not go into details as to the patented prior art, and content myself with holding that I find nothing therein that anticipates or renders invalid the claims of the patent in suit.

### Question of Infringement.

Daily appears to have been the first to provide a gas-fired steam radiator having a single specially constructed section, provided with means therein for handling variations in draft conditions. His was the first to provide a radiator having a special vent section for taking care of strong draft and back draft conditions, where the products of combustion flow upwardly in reaching the flue outlet, as contrasted with structures where they are forced to flow downwardly in

reaching the flue outlet. This is an important aspect, in view of the laws governing drafts in appliances such as these. Daily was the first to provide a back draft diverter cast integrally with a radiator section, from which a unitary vent section results. The radiator thus constructed cannot be assembled without assembling the back draft diverter, and the latter cannot be destroyed without destroying the vent section. The device is very simple in design, and is more efficient than that of any other construction in evidence. Daily also was the first to have the burner extending lengthwise throughout the radiator, a central vent section for receiving all of the products of combustion, and means within the central section for efficiently accommodating variations in draft conditions.

Beside these broad considerations, the construction in question involves certain important characteristics to bring about the improved results: For instance, a walled chamber having a flue connection in the rear and an atmospheric opening in the front; a top wall extending from above the flue opening forwardly and downwardly above a baffle, which extends upwardly from a point beneath the atmospheric opening; this baffle directs the products of combustion toward the flue, and the parts are arranged in such manner that the back draft passes transversely to the direction of flow of the combustion products, and syphons them out of the radiator. This combination, containing these various provisions, is found in the patent in suit, forms the subject-matter of the claims in suit, and is not to be found in the prior art.

The two radiators of defendant differ only in that the vertically extending portion of the inclined member *C* has been eliminated in the radiator now being manufactured. It appears reasonably clear that the claims in suit read plainly on the defendant's structures. In both, there is "a walled chamber for the reception of products of combustion." This refers in each to the chamber located in the vent section. The term "walled chamber" does not necessarily include the side walls *18* shown in the drawing of the Daily patent. During the prosecution of the Daily application before the Patent Office, when the question as to the meaning of the word "walled" was raised, the applicant succeeded in maintaining his position that the claims should not be limited to a "chamber having a plurality of side walls." It would appear, therefore, that the claims should be construed as broad enough to include walled chambers without the specific side walls *18* illustrated in the drawings of the patent.

This conclusion is strengthened by the fact that in other claims not in suit "side walls" are included, and their omission from the claims in suit indicate that these are intended to have a broader scope. If the side walls are eliminated from the Daily radiator, there is still a walled chamber remaining. The patent states that the chamber has a top wall *20*, a front wall *19*, a rear wall *24*, all of which are found in the same relationship in defendant's radiator. The defendant's radiator comprises, in the same relationship and in the same location, the combustion chamber described in the patent in suit. This is located beneath the water chamber, in the bottom of the radiator, and contains the burner.

There can be no real question that defendant's radiator has a chamber in which the burning of the gas takes place below the water chamber, and that the products of combustion pass up through spaces *E* into an upper chamber, just as described in the Daily patent. In the claims in suit, there is a baffle in the vent section extending upwardly toward the flue opening, its function being to direct the rising gases toward the flue opening in an out draft, and, with the downwardly extending top wall, it serves to direct the downwardly flowing air of a back draft outwardly into the room, preventing such air from entering the combustion chamber.

It seems entirely clear, under all the facts in the case, that the inclined front wall of defendant's radiator serves as a baffle and directs the products of combustion toward the flue opening. And so, in the case of a back draft, the wall serves to direct the outwardly flowing gases in precisely the same way as they are directed by the baffle in the Daily patent. The fact that the defendant has made a sloping front wall serve the function both of a front wall and baffle of the Daily radiator does not avoid infringement, so long as the single element performs the function of both in substantially the same way. Gibbs v. Triumph Trap Co., Inc. (C. C. A. 2d) 26 F.(2d) 312.

In relation to the top wall in claim 2, it appears plain that the forwardly and downwardly extending wall *D* in defendant's vent section is the equivalent of the forwardly and downwardly curved wall in plaintiff's vent section. Not only are the functions of the top wall substantially the same in both radiators, but also the appearance or con-

struction of the top wall in defendant's structure is the full equivalent of that in the patented structure.

During the development of the Daily radiator, the plaintiff company expended about $25,000 in advertising its type of radiator. A market was created by the plaintiff for its radiators, and for about six years a large business was done in the sale and use of the patented device. It was not until 1928, when the defendant abandoned the external draft diverter and adopted the internal back draft diverter complained against, that competition arose in the field which plaintiff had developed and which it alone was occupying.

From the foregoing considerations, I find claims 1, 2, and 3 of the Daily patent in suit are valid and infringed by the defendant.

Let a decree be drawn accordingly.